IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Myra Michelle Womble, | ) | C/A No.: 1:15-3017-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be reversed
and remanded for further proceedings as set forth herein.

I.      Relevant Background

    A.      Procedural History

    On September 9, 2011, Plaintiff protectively filed an application for DIB in which
she alleged her disability began on October 15, 2008. Tr. at 113, 191–99. Her application
was denied initially and upon reconsideration. Tr. at 129–33, 139–41. On September 10,

2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 29–68 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 31, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 31, 2015. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 42 years old at the time of the hearing. Tr. at 36. She completed high school and obtained associate's degrees in health care and health care management. Tr. at 37–38. Her past relevant work ("PRW") was as a health care administrator, a ward clerk, an orderly, an insurance claims clerk, an insurance adjuster, and an authorization clerk. Tr. at 56–60. She alleges she has been unable to work since October 15, 2008. Tr. at 193.

          2.     Medical History

Aside from consultative examinations, Plaintiff received all of her medical treatment through the Veterans Administration ("VA") medical facilities during the relevant period. The record does not include medical evidence for the period prior to June 16, 2009. *See* Tr. at 303–409. However, it includes a rating decision from the VA that explains that Plaintiff's overall disability rating percentage was 100% effective November 6, 2007. Tr. at 522.

Plaintiff presented to Carl H. Lopez, M.D. ("Dr. Lopez"), for a primary care visit on June 16, 2009. Tr. at 447. Plaintiff complained of increased glucose readings, arthralgia in her legs and feet, insomnia, and depression. *Id.* She also endorsed fatigue and blurred vision. Tr. at 449. Dr. Lopez observed no abnormalities on physical examination. Tr. at 451. He changed Plaintiff's insulin to Novolin 70/30 and increased her dosage. *Id.* He prescribed Trazodone for insomnia and depression. *Id.*

Plaintiff attended a consultation with optometrist William J. McGill, O.D. ("Dr. McGill"), on July 15, 2009. Tr. at 359. Dr. McGill assessed mild diabetic retinopathy that was more significant on the right than on the left, blurred vision, dry eye syndrome, and ocular allergy. Tr. at 360–61.

On July 15, 2009, Plaintiff reported to Sharee C. Smith, Pharm. D. ("Dr. Smith"), that she had recently been noncompliant with her insulin because she went out of town and forgot it. Tr. at 439. She indicated she exercised two or three times per week by walking or swimming. Tr. at 440. Dr. Smith indicated Plaintiff's hemoglobin A1c was above its goal at 11.8%. Tr. at 441. She counseled Plaintiff extensively on her diet and advised her to cut back on sugary juices, pasta, and rice. *Id.* She increased Plaintiff's Novolin dosage to 46 units in the morning and 48 units in the evening. *Id.*

On July 29, 2009, Plaintiff reported to Dr. Smith that she was walking more frequently, improving her diet, and was generally compliant with her medications. Tr. at 431. Dr. Smith continued Plaintiff's dosages of Novolin and Atenolol and prescribed Lisinopril/Hydrochlorothiazide ("HCTZ") 20/12.5 milligrams. Tr. at 433.

On August 19, 2009, Plaintiff reported to Dr. Smith that she had decreased her Novolin dosage to 40 units twice daily over the prior two-week period. Tr. at 427. She endorsed symptoms of hypoglycemia and indicated she felt jittery when she awoke in the morning. *Id.* She did not bring her glucose log, but indicated her readings were generally less than 120 and that her highest reading had been 178. Tr. at 428. Dr. Smith noted that Plaintiff's A1c had improved, but remained above its goal. Tr. at 429. She instructed Plaintiff to continue taking her insulin at the adjusted dosage. *Id.*

On September 21, 2009, Plaintiff reported to Dr. Smith that her highest blood glucose reading was 91 and that she was compliant with diet, exercise, and medications. Tr. at 425. Dr. Smith indicated Plaintiff's hemoglobin A1c remained elevated, but that her blood glucose readings were below goal. Tr. at 426. She recommended Plaintiff continue her current medication regimen. *Id.* She noted Plaintiff's blood pressure was elevated and increased Lisinopril/HCTZ to 20/25 milligrams daily. *Id.* She instructed Plaintiff to maintain a blood pressure log. *Id.*

On December 7, 2009, an x-ray of Plaintiff's lumbar spine showed mild sacroiliac joint degenerative changes, but no acute fracture or dislocation. Tr. at 304–05.

On January 6, 2010, Plaintiff indicated to Dr. Lopez that she had been skipping doses of Novolin because the needles hurt her thighs. Tr. at 417. She complained of nocturia, arthralgias to her legs and feet, insomnia and sinus pressure and drainage. *Id.* She indicated Trazodone helped her insomnia, but caused daytime drowsiness. *Id.* Dr. Lopez ordered 31g equipped syringes and instructed Plaintiff to administer her insulin in her abdomen. Tr. at 421. He increased Plaintiff's dosage of Venalafaxine to address her

complaints of arthralgia in her legs and feet, insomnia, and depression. *Id.* He indicated Plaintiff's hypertension was not at its goal and decreased her HCTZ dosage, but added Amlodipine. *Id.*

Plaintiff admitted to poor diet, poor compliance, and multiple missed insulin doses during a pharmacy visit on January 13, 2010. Tr. at 414–15. Dr. Smith noted that Plaintiff had been going through a stressful time recently because she was dealing with family issues and attempting to obtain an advanced degree. Tr. at 415. She indicated Plaintiff had lost focus on controlling her sugars and maintaining compliance. *Id.*

Plaintiff presented to Matthew Shlapack, M.D. ("Dr. Shlapack"), on January 20, 2010, for an endocrinology consultation. Tr. at 342. She indicated she had been more complaint with insulin therapy in the past when she administered her insulin through a pen. *Id.* Her blood glucose log showed values that ranged from 100 to 300. *Id.* Dr. Shlapack assessed uncontrolled diabetes and prescribed 80 units of Lantus insulin to be administered at bedtime with a Solostar pen and five units of Aspart to be administered three times a day through a Flexpen. Tr. at 344–45. He instructed Plaintiff to resume her statin therapy. Tr. at 345.

Plaintiff followed up with Dr. Lopez on January 28, 2010. Tr. at 404. She expressed a desire to switch medications because her current medications for hypertension and hyperlipidemia did not react well with grapefruit juice. *Id.* She complained of dry skin and a tender knot below the right side of her jaw. *Id.* Plaintiff endorsed no other complaints, and Dr. Lopez observed no abnormalities on examination. Tr. at 405, 407. Dr. Lopez changed Plaintiff's statin medication from Zocor to Pravastatin

and her hypertension medication from Amlodipine to Lisinopril so that she could continue to drink grapefruit juice. Tr. at 407. He prescribed Doxycycline for the small knot below her jaw and Synthroid for hypothyroidism. *Id.*

Dr. Shlapack contacted Plaintiff on January 29, 2010, after he conferred with Dr. Lopez. Tr. at 403. He instructed Plaintiff to add an additional injection of 40 units of Lantus in the morning and to continue her other medications. *Id.*

On February 9, 2010, Plaintiff presented to Claire Moise for nutritional education. Tr. at 338. She stated she had stopped taking insulin prior to her last doctor's visit because the needle caused her legs to become very painful and bruised, but had resumed use of insulin because her doctor prescribed an insulin pen with a smaller needle. Tr. at 339. She stated she engaged in exercise five days per week that included yoga, Wii Fit, and running. *Id.*

Plaintiff followed up with Dr. Shlapack on February 24, 2010. Tr. at 400. Dr. Shlapack noted that Plaintiff's blood glucose log showed excellent control with values ranging from 110 to 150. *Id.* Plaintiff reported persistent fatigue, but denied other symptoms. *Id.* Dr. Shlapack observed that Plaintiff's hemoglobin A1c remained significantly elevated, but opined that the discrepancy between her hemoglobin A1c and her blood glucose readings reflected control over a period of only three weeks. Tr. at 402. He indicated Plaintiff should continue her current medications for diabetes and hypothyroidism. *Id.* He also noted Plaintiff had a vitamin D deficiency and should start taking 50,000 units of Ergocalceferol per week for a period of 12 weeks. *Id.*

On May 24, 2010, Plaintiff informed Dr. Shlapack that she had only been administering 40 units of Lantus instead of 80 units, as prescribed. Tr. at 391. She stated that her insulin "ooze[d] out" if she administered 80 units and that she experienced a rash and burning sensation at the injection site. *Id.* Dr. Shlapack informed Plaintiff of the option to change her insulin from Lantus to Levemir, but Plaintiff resisted the change because Levemir was not available in a pen. Tr. at 393. Dr. Shlapack instructed Plaintiff to change her Lantus dosage to 60 units twice a day and to use seven units of Aspart three times a day. *Id.*

On September 27, 2010, Plaintiff reported to Dr. Shlapack that her fasting blood glucose ranged from 92 to 115 and that her daytime values ranged from 126 to 287, but averaged 160. Tr. at 381. Dr. Shlapack indicated Plaintiff's reported blood glucose levels were inconsistent with her hemoglobin A1c. *Id.* He questioned Plaintiff about the inconsistency, and she admitted she had been more compliant with her insulin regimen over the past two weeks. *Id.* He noted Plaintiff demonstrated decreased sensation to light touch on neurological testing. Tr. at 383. He described Plaintiff's diabetes as "[v]ery uncontrolled." *Id.* He noted Plaintiff changed her insulin regimen from the prescribed regimen and stated she should be taking 80 units of Lantus at night and 10 units of Novolog three times a day. *Id.*

Plaintiff followed up with Dr. Shlapack on January 31, 2011. Tr. at 373. She reported morning blood glucose readings below 115 and daytime readings that ranged from 130 to 142. *Id.* She stated she was following her diet, but was not injecting the entire dose of insulin because of injection-site swelling. *Id.* Dr. Shlapack indicated

7

Plaintiff's diabetes was "very uncontrolled" and noted that her self-reported blood glucose readings did not correlate with her hemoglobin A1c level. Tr. at 375. He prescribed 40 units of Lantus twice a day and 10 units of Novolog three times a day. *Id.*

On November 4, 2011, Dr. Lopez requested that Plaintiff receive bilateral cock-up wrist splints for carpal tunnel syndrome ("CTS"). Tr. at 479–80.

Plaintiff presented to Damon Daniels, M.D. ("Dr. Daniels"), for a consultative examination on November 23, 2011. Tr. at 457–60. She complained primarily of low back pain that worsened with changes in the weather and prolonged sitting. Tr. at 457. She described it as sharp and intermittent with associated numbness in both legs. *Id.* She endorsed a history of bilateral CTS and described tingling in her hands. *Id.* She reported abilities to walk continuously for 15 minutes, to stand for 15 minutes, to sit for 30 to 45 minutes, and to comfortably lift five to 10 pounds. *Id.* Dr. Daniels observed Plaintiff to move from the chair to the exam table with a slow gait; to be able to get on the table without assistance; to have no apparent deformities in her upper or lower extremities; to demonstrate increased pain with range of motion ("ROM") testing in her lower extremities and hips; to have equal and symmetric muscle bulk in her upper and lower extremities; to be able to tandem walk; to be unable to perform the heel-toe walk with her left lower extremity; to be able to squat 50%; to have normal ROM in her cervical spine, shoulders, elbows, wrists, knees, hips, and ankles; to flex her spine to 60 degrees, to extend her spine to 15 degrees, to laterally flex her lumbar spine to 15 degrees; to have a negative straight-leg raising test bilaterally; to demonstrate no joint deformity, swelling, or decreased ROM in her hands; to have 4/5 bilateral grip strength; to have intact fine and

gross manipulation; to be alert and oriented; to demonstrate 5/5 strength in the proximal and distal muscle groups of her upper extremities; to have 4/5 strength in her hands; to have 4/5 strength in the proximal and distal muscle groups of her right lower extremity and 3/5 strength in the proximal and distal muscle groups of her left lower extremity; to have intact sensation to light touch and pinprick in her bilateral upper and lower extremities; and to have appropriate insight, somewhat flat mood, and grossly intact memory. Tr. at 458–59. He assessed chronic low back pain, CTS, and degenerative disc disease of the lumbar spine. Tr. at 459–60. Dr. Daniels stated the following: "The patient's most significant findings are _____ [sic] her back. She definitely had decreased range of motion on range of motion testing. Speech, language and memory were intact." Tr. at 460. An x-ray of Plaintiff's lumbar spine showed scoliosis convex toward the right; facet arthropathy, left greater than right at L3-4, L4-5, and L5-S1; and disc disease at L4-5 with marked loss of disc height. Tr. at 455.

On November 30, 2011, Plaintiff's hemoglobin A1c was significantly elevated at 12.9%. Tr. at 486. She denied symptoms of depression. Tr. at 487. She reported her ability to exercise was limited by pain. Tr. at 488. She reported tingling in her feet, and uncontrolled hypertension and hyperlipidemia. Tr. at 491. Dr. Lopez indicated Plaintiff was not compliant with her prescribed dose of insulin. *Id.* He prescribed Gabapentin for diabetic neuropathy, increased Plaintiff's dosages of Lisinopril and Pravastatin, and instructed her to follow up with endocrinology. Tr. at 494.

On December 2, 2011, state agency consultant Kimberly Brown, Ph. D. ("Dr. Brown"), reviewed the evidence and completed a psychiatric review technique form

("PRTF"). Tr. at 106–07. She considered Listing 12.04 for affective disorders and assessed Plaintiff to have no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.*

State agency medical consultant S. Farkas, M.D. ("Dr. Farkas"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment on December 8, 2011. Tr. at 108–10. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and frequently handle and use hand controls to push/pull with the bilateral upper extremities. *Id.*

Plaintiff contacted the VA Medical Center by telephone on December 13, 2011, to report that she was having problems with anxiety and was not sleeping. Tr. at 482. Dr. Lopez indicated he could not prescribe Plaintiff medications for sleep and anxiety without examining her. Tr. at 483. Plaintiff indicated her sleep and anxiety issues were an ongoing problem and that she did not understand why she needed to be seen when she was last seen two weeks earlier. Tr. at 484. Dr. Lopez ordered 50 milligrams of Trazodone and instructed Plaintiff to take one-half to one tablet at night for sleep. *Id.*

Plaintiff presented to A. Nicholas DePace, Ph. D. ("Dr. DePace"), for an adult mental status examination on March 28, 2012. Tr. at 504–07. She indicated she had filed for disability benefits because of "severe struggles with depression as well as diabetes,

back pain, irritable bowel syndrome ("IBS"), CTS, and migraines for several years." Tr. at 504. She indicated her symptoms of depression worsened in late 2011, after her father, mother-in-law, and sister-in-law died within a couple of months of each other. *Id.* She indicated that she had earned two associate's degrees, but could only recall that one was in the field of healthcare management. *Id.* She stated she only interacted with her husband, her son, and a few other people. Tr. at 505. She indicated she was unmotivated to drive or to perform household chores. *Id.* She endorsed problems with her memory and stated her husband had to remind her to engage in personal hygiene and to eat. *Id.* She reported constant crying episodes and poor appetite and sleep. *Id.* Dr. DePace observed Plaintiff's hair to be "somewhat disheveled" and noted that she was wearing pajama pants and bedroom slippers. Tr. at 506. Plaintiff was unable to provide her social security number, address, zip code, the season, or the correct day of the week. *Id.* Dr. DePace indicated Plaintiff's affect was constricted. *Id.* He noted that Plaintiff's thought processes were goal-directed and coherent and that her responses indicated she understood the questions that were being asked of her. *Id.* Plaintiff was unable to maintain eye contact. *Id.* She denied auditory and visual hallucinations. *Id.* She reported limited tolerance for frustration and was tearful during the evaluation. *Id.* Dr. DePace indicated that Plaintiff reported symptoms consistent with major depressive disorder, but that it was necessary to "[c]onsider exaggeration and/or malingering of emotional problems." *Id.* He stated personality disorder, not otherwise specified ("NOS"), should be considered, as well. *Id.* He noted that Plaintiff reported symptoms that included "lack of interest in previously enjoyable activities, sad mood, crying episodes, sleep and appetite problems, and

problems with concentration." *Id.* However, he stated that "numerous behavioral observations" raised questions regarding the validity of the information Plaintiff reported. Tr. at 507. He specified that Plaintiff did not put forth appropriate effort based on her dramatic presentation and her inability to recall basic overlearned information that even those with severe depression are able to recall. *Id.* He suggested Plaintiff's symptoms would likely improve with medication and medical management. *Id.* He stated Plaintiff had the cognitive ability to perform all activities of daily living and indicated "[h]er assertion that she has no motivation or memory to perform higher-order activities of daily living should be viewed with some skepticism until additional data is available." *Id.* He indicated he believed Plaintiff was capable of performing three-step commands. *Id.*

On April 3, 2012, state agency consultant Kevin King, Ph. D. ("Dr. King"), completed a PRTF. Tr. at 120–21. He considered Listing 12.04 for affective disorders and assessed mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation that were of extended duration. Tr. at 120.

Plaintiff presented to Ijeoma A. Kene-Ewulu, M.D. ("Dr. Kene-Ewulu"), for a primary care visit on April 10, 2012. Tr. at 713. She complained of pain throughout her trunk and back that interfered with her ability to perform her usual activities. Tr. at 714. She endorsed symptoms of grief and depression and stated she was unable to sleep, relax, or interact. *Id.* Dr. Kene-Ewulu observed Plaintiff to demonstrate a slow, stiff gait and to be tearful. *Id.* He noted general tenderness across Plaintiff's back, rib cage, flank, and upper arms. *Id.* He indicated Plaintiff's hemoglobin A1c was consistently over 12% and

12

that she had proteinuria. *Id.* Plaintiff stated she was in so much pain that she had stopped administering insulin injections over the past two months. *Id.* Dr. Kene-Ewulu prescribed a selective serotonin reuptake inhibitor ("SSRI") for depression, a muscle relaxant for pain, and a diuretic for hypertension. Tr. at 714–15. He discontinued Pravastatin and prescribed Simvastatin for hyperlipidemia. Tr. at 715.

State agency medical consultant Rebecca Meriwether, M.D. ("Dr. Meriwether"), completed a physical RFC assessment on April 11, 2012. Tr. at 122–24. She indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and frequently handle and finger with the bilateral upper extremities. *Id.*

Dr. Kene-Ewulu contacted Plaintiff to follow up on her diabetes on April 16, 2012. Tr. at 711. Plaintiff stated she had only been able to administer insulin twice since her visit on April 10. *Id.* She indicated Metformin had exacerbated her IBS in the past. *Id.* Dr. Kene-Ewulu replaced Plaintiff's mealtime insulin with Glipizide and instructed her to avoid using Novolog and Glipizide at the same meal. *Id.*

Plaintiff presented to Erin Johnson, Ph. D. ("Dr. Johnson"), for an initial mental health visit on April 23, 2012. Tr. at 705. She stated she was grieving the loss of several family members over the last year. Tr. at 706. She reported symptoms that included depressed mood, irritability, and a lack of energy and motivation. *Id.* Plaintiff indicated

13

Trazodone was helpful for sleep, but denied significant mood change since starting Sertraline. *Id.* She stated she no longer exercised because of her pain. Tr. at 708. Dr. Johnson observed Plaintiff to be alert and oriented in all spheres; to maintain good eye contact; to speak at a normal rate and tone; to show a depressed mood and affect; to engage in appropriate behavior; to demonstrate logical, sequential, and goal-directed thought processes and content; to demonstrate no evidence of mania, paranoia, psychosis, or suicidal or homicidal thoughts; and to be neatly dressed and well groomed. Tr. at 709. She indicated Plaintiff "would very much benefit from depression treatment currently." *Id.* Dr. Johnson assessed a global assessment of functioning ("GAF")[1] score of 52. Tr. at 710. Plaintiff denied suicidal thoughts and endorsed no history of suicide attempts. Tr. at 703. She endorsed feelings of hopelessness as a result of migraine headaches, IBS, and fibromyalgia. *Id.* Dr. Johnson determined Plaintiff be at low risk for suicide. Tr. at 704.

On April 30, 2012, Plaintiff presented to a behavioral health group therapy session led by Dr. Johnson and psychology intern Judith Legault ("Ms. Legault"). Dr. Johnson and Ms. Legault indicated Plaintiff's mood was depressed, but that she was somewhat receptive to the group discussion. Tr. at 702. Plaintiff returned to the behavioral health group on May 7, 2012. Tr. at 699. Dr. Johnson noted that Plaintiff became upset and tearful during the group session and that they spoke outside the group setting. Tr. at 700.

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

Plaintiff informed Dr. Johnson that she had recently felt overwhelmed and indicated her medications made her feel drowsy and "out of it." *Id.* Dr. Johnson encouraged Plaintiff to inform her primary care physician of her medication side effects. *Id.* Plaintiff actively participated in the behavioral health groups on May 21 and 22, 2012. Tr. at 694, 696.

Plaintiff presented to Dr. Kene-Ewulu for a primary care visit on May 24, 2012. Tr. at 687. She denied headaches, dizziness, chest pain, shortness of breath, lower extremity edema, gastrointestinal distress, dysuria, and homicidal or suicidal ideations. Tr. at 688. She stated her depression had improved and that Sertraline was helping. *Id.* Dr. Kene-Ewulu noted that Plaintiff "was still weepy" in his office and continued to receive counseling. *Id.* He described Plaintiff's affect as mildly constricted and her mood as subdued. Tr. at 692. He stated Plaintiff's A1c was worse at 13.2%, and Plaintiff admitted that she had not been taking Glipizide regularly. Tr. at 688. Dr. Kene-Ewulu emphasized control of Plaintiff's diabetes and added a prescription for Metformin. *Id.* Plaintiff complained of intermittent diffuse muscle spasms in her mid and lower back. Tr. at 689. Dr. Kene-Ewulu encouraged Plaintiff to take her Gabapentin nightly and indicated he would request a consultation for a transcutaneous electrical nerve stimulation ("TENS") unit. *Id.* He noted Plaintiff's blood pressure was not at its target and increased her dosage of HCTZ to 25 milligrams and combined it with 40 milligrams of Lisinopril. *Id.*

Plaintiff participated in the behavioral health groups on June 4 and June 11, 2012. Tr. at 682, 685. Ms. Legault described Plaintiff as having a euthymic mood and actively participating in the group sessions. Tr. at 683, 685.

Plaintiff presented to physical therapy on June 19, 2012, for trial of a TENS unit to treat her low and mid back pain. Tr. at 556. She indicated her pain decreased from a six to a zero on a 10-point scale with use of the TENS unit. Tr. at 556–57. The physical therapist provided Plaintiff with instructions on proper use of the TENS unit and issued it to her for home use. Tr. at 557.

Plaintiff presented to Michelle Parnell, M.D. ("Dr. Parnell"), for a compensation and pension ("C&P") examination on July 9, 2012. Tr. at 665. Dr. Parnell indicated Plaintiff was diagnosed with major depressive disorder that was characterized by social and occupational impairment with reduced reliability and productivity. Tr. at 667, 669. She assessed Plaintiff's current GAF score as 55. Tr. at 669. Plaintiff reported difficulty with pain management and stated she stayed in bed on some days. Tr. at 670. She endorsed difficulty sleeping as a result of pain, IBS, migraines, and fibromyalgia. *Id.* She reported decreased energy, motivation, appetite, and ability to engage in activities she previously enjoyed. *Id.* She stated she experienced moodiness, irritability, and tearfulness. *Id.* Dr. Parnell identified Plaintiff's symptoms as depressed mood; chronic sleep impairment; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Tr. at 671. She concluded that Plaintiff did not present with a significant increase in the severity of her depression from her previous C&P exam on December 5, 2009. Tr. at 672.

On July 18, 2012, Angela Snowden indicated Plaintiff met her blood pressure goal and should continue her current medications. Tr. at 664.

Plaintiff presented to Kenneth H. Fox, M.D. ("Dr. Fox"), for a C&P examination on July 23, 2012. Tr. at 611. Dr. Fox indicated Plaintiff was diagnosed with type II diabetes mellitus and that she was prescribed oral hypoglycemic medications. Tr. at 624. He noted Plaintiff had complications of diabetes that included diabetic peripheral neuropathy, diabetic nephropathy or renal dysfunction caused by diabetes, and diabetic retinopathy. Tr. at 625. He noted Plaintiff had been diagnosed with IBS, but that she did not require continuous medication for control of the condition. Tr. at 631, 632. He identified Plaintiff's symptoms as alternating diarrhea and constipation, daily abdominal distension, transient and intermittent nausea, and occasional cramping. Tr. at 633. He stated Plaintiff's episodes of bowel disturbance with abdominal distress occurred occasionally, but that she had experienced seven or more attacks in the past 12 months. Tr. at 633–34. He indicated Plaintiff had not experienced weight loss, malnutrition, or other serious complications as a result of her intestinal condition. Tr. at 634. Dr. Fox stated Plaintiff's intestinal condition would impact her ability to work because she experienced episodic urgent diarrhea. Tr. at 637. He indicated Plaintiff had been diagnosed with lumbar strain. Tr. at 645. He observed Plaintiff to have the following ROM: forward flexion to 50 degrees; extension to 20 degrees; right lateral flexion to 25 degrees; left lateral flexion to 25 degrees; right lateral rotation to 30 degrees; and left lateral rotation to 30 degrees.[2] Tr. at 646–47. He also noted Plaintiff had localized tenderness to palpation in her back. Tr. at 649. He observed Plaintiff to have normal

---

[2] The test results indicate the following normal values: flexion to 90 degrees; extension to 30 degrees; right and left lateral flexion to 30 degrees; and right and left lateral rotation to 30 degrees. Tr. at 646–47.

strength with hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion, and great toe extension. *Id.* He stated Plaintiff had no muscle atrophy. *Id.* Dr. Fox suspected Plaintiff's sensory deficits had resulted from diabetic peripheral neuropathy. Tr. at 650. He indicated a straight-leg raise test was negative and stated Plaintiff did not have evidence of radiculopathy. Tr. at 651. He noted Plaintiff required the occasional use of a cane. Tr. at 653. Dr. Fox indicated Plaintiff had been diagnosed with diabetic peripheral neuropathy that caused mild paresthesias and/or dysesthesias in her bilateral upper extremities; moderate paresthesias and/or dysesthesias in her bilateral lower extremities; and mild numbness in her bilateral upper and lower extremities. Tr. at 656. He observed Plaintiff to demonstrate normal strength with elbow flexion, elbow extension, wrist flexion, wrist extension, grip, pinch, knee extension, knee flexion, ankle plantar flexion, and ankle dorsiflexion. Tr. at 657–58. Plaintiff had normal deep tendon reflexes in all areas tested. Tr. at 658. She demonstrated decreased sensation to light touch in her hands/finger and feet/toes, but normal sensation in her forearms, shoulders, knees/thighs, and ankles/lower legs. Tr. at 658–59. Dr. Fox opined that Plaintiff's diabetic peripheral neuropathy did not impact her ability to work. Tr. at 663.

Plaintiff presented to Dr. Johnson for a behavioral activation group appointment on August 6, 2012. Tr. at 608. Dr. Johnson noted that Plaintiff's mood was depressed, but that she participated actively in the session. Tr. at 609.

Plaintiff presented to Eduardo Irizarry, M.D. ("Dr. Irizarry"), for a C&P examination on August 7, 2012. Tr. at 604–08. Dr. Irizarry indicated Plaintiff had been diagnosed with migraine headaches. Tr. at 604. He stated Plaintiff did not take

medication for her migraines because of liver problems. Tr. at 605. He noted that Plaintiff experienced headache pain that worsened with physical activity. *Id.* He indicated Plaintiff's headaches were accompanied by symptoms that included nausea, vomiting, and sensitivity to light and sound. Tr. at 606. He described Plaintiff's headaches as occurring more often than once a month and lasting for more than two days at a time. *Id.* Dr. Irizarry opined that Plaintiff's headaches impacted her ability to work. Tr. at 608.

On August 7, 2012, Plaintiff's primary care physician Ijeoma A. Kene-Ewulu, M.D. ("Dr. Kene-Ewulu"), contacted her regarding her complaint of abdominal cramping, abnormal stools, nausea, and indigestion. Tr. at 602–03. Dr. Kene-Ewulu indicated Plaintiff had a remote history of IBS and stated that Plaintiff's symptoms may be related to IBS or may be the result of an infection. Tr. at 603. He prescribed 20 milligrams of Bentyl and probiotics and encouraged Plaintiff to consume plenty of liquids. *Id.* He sent a letter to Plaintiff that indicated her cholesterol and diabetes control were significantly improved. Tr. at 603–04.

On August 22, 2012, Plaintiff reported to Dr. Johnson that she was feeling less depressed and indicated that journaling was helping her to deal with the grief associated with losing her father. Tr. at 601–02.

Plaintiff attended an optometry visit with Dr. McGill on September 18, 2012. Tr. at 596–601. Dr. McGill diagnosed moderate nonproliferative diabetic retinopathy, dry eye syndrome, ocular allergies, and blurred vision in Plaintiff's bilateral eyes. Tr. at 599.

On September 26, 2012, Plaintiff reported to Dr. Johnson that her depression worsened when she experienced fibromyalgia flare ups. Tr. at 595. Dr. Johnson

encouraged Plaintiff to take more baths and to consider yoga to alleviate symptoms of fibromyalgia. Tr. at 595. Plaintiff indicated she had recently been more irritable with her son. *Id.* Dr. Johnson encouraged her to engage in more one-on-one activities and to continue journaling to get through the bereavement process. Tr. at 595–96.

On October 1, 2012, Plaintiff presented to the behavioral activation after care group. Tr. at 588–90. She indicated she was continuing to struggle with grief following the loss of several family members. *Id.* Ray Katzenbach, M.D. ("Dr. Katzenbach"), described Plaintiff as "neatly dressed and well groomed" and indicated she greeted him "with a friendly handshake" and "spoke with an appropriate cadence, rate and tone." Tr. at 589. He observed Plaintiff to be oriented to person, place, time, and situation and to exhibit no signs of delusions, illusions, mania, paranoia, or hallucinations. *Id.* He noted Plaintiff maintained eye contact and described her mood as "pretty good." *Id.* He indicated she was active, alert, and engaged throughout the interview and demonstrated no behavioral abnormalities. *Id.* He stated Plaintiff's diagnosis was depressive disorder, NOS. *Id.*

Plaintiff presented to Nicole Y. Edwards, M.D. ("Dr. Edwards"), for a C&P examination on December 22, 2012. Tr. at 564–78. Dr. Edwards indicated Plaintiff had been diagnosed with diabetic nephropathy. Tr. at 564. She noted that Plaintiff had a history of poorly-controlled diabetes and that nephropathy was noted in lab work in 2008. Tr. at 565. She stated Plaintiff had no evidence of renal dysfunction and no history of urolithiasis or recurrent urinary tract or kidney infections. Tr. at 566–67. She indicated Plaintiff's kidney condition did not affect her ability to work. Tr. at 571. Dr. Edwards

evaluated Plaintiff for fibromyalgia. *Id.* She indicated Plaintiff reported that she had developed fatigue, headaches, and body aches and had negative workups with a neurologist and rheumatologist. *Id.* She noted that Plaintiff had been treated with Gabapentin and Trazodone for two to three years. *Id.* Dr. Edwards indicated Plaintiff's symptoms of fibromyalgia included positive trigger points, unexplained fatigue, sleep disturbance, paresthesias, headache, alternating diarrhea and constipation, abdominal cramps, abdominal bloating, depression, anxiety, Raynaud's-like symptoms, frequency, difficulty concentrating, and musculoskeletal symptoms. Tr. at 572. Plaintiff indicated her symptoms were constant and were exacerbated by emotional stress, cold or damp weather, insufficient sleep, and overexertion. *Id.* Plaintiff's musculoskeletal symptoms included widespread musculoskeletal pain, stiffness, muscle weakness, achiness, myalgia, arthralgia, and decrease exercise tolerance. *Id.* She reported pain in her bilateral arms, bilateral legs, and back. *Id.* Dr. Edwards indicated Plaintiff had multiple tender points on both her left and right sides. Tr. at 572–73. She noted that Plaintiff was very stiff when sitting, standing, and walking. Tr. at 573. She stated Plaintiff had a diagnosis of fibromyalgia, as shown on examination. Tr. at 574.

On April 12, 2013, nurse Angela Snowden ("Ms. Snowden"), contacted Plaintiff to discuss her recent lab work. Tr. at 766. Plaintiff's husband answered the call and reported that Plaintiff was in bed with a migraine. *Id.* Ms. Snowden asked Plaintiff's husband to inform her that her recent A1c result was 15% and that she would need to resume use of insulin. *Id.*

Plaintiff followed up with Dr. Kene-Ewulu on April 29, 2013. Tr. at 760. Dr. Kene-Ewulu indicated Plaintiff's diabetes was uncontrolled. *Id.* He discontinued Glipizide and Metformin and prescribed Glargine insulin. *Id.* He noted Plaintiff's hypertension was uncontrolled and increased her dosage of Diltiazem to 240 milligrams daily. *Id.* He indicated Plaintiff's son's health issues were causing her some distress, but that she was receiving support from her husband and following up with mental health. *Id.*

Plaintiff presented to Dr. McGill for an ocular examination on May 14, 2013. Tr. at 756. Dr. McGill diagnosed severe nonproliferative diabetic retinopathy in Plaintiff's right eye and mild-to-moderate nonproliferative diabetic retinopathy in her left eye, as well as dry eye syndrome, ocular allergies, and blurred vision in her bilateral eyes. Tr. at 758.

On June 11, 2013, Plaintiff presented to occupational therapy and requested that a longer bath tub and a higher toilet be installed in her home. Tr. at 739. She stated that her physicians had advised her to soak in a tub several times a day to alleviate symptoms of fibromyalgia and neuralgia. *Id.* She indicated her toilet was too low and was exacerbating her back pain. *Id.*

Plaintiff's hemoglobin A1c was elevated at 10.2% on July 22, 2013. Tr. at 749.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 10, 2013, Plaintiff testified she lived in a house with her husband and 18 year old son. Tr. at 37. She indicated she was 6' 1" tall and weighed 162 pounds. Tr. at 36. She stated she received disability benefits from the VA. Tr. at 37.

Plaintiff testified she resigned from her job with the Health Plan of Nevada because she had missed too many days and was told by her boss that she could either resign or be fired. Tr. at 38–39. She indicated she was having problems with her migraines and IBS at that time. Tr. at 43. She stated she had not worked or collected unemployment benefits since October 15, 2008. Tr. at 39.

Plaintiff testified that she experienced pain, numbness, and stiffness. Tr. at 41. She endorsed occasional migraines that lasted from one day to one week at a time. Tr. at 42, 44. She indicated her migraines were accompanied by nausea, vomiting, and sensitivity to light, noise, and smell. Tr. at 44. She denied receiving specific treatment for migraines because she had a history of liver damage and her physicians indicated that migraine medication could further damage her liver. Tr. at 45. She stated her fibromyalgia caused stiffness that required she adjust and move around. Tr. at 42. She indicated she had to visit the restroom frequently because of IBS. *Id.* She endorsed around seven episodes of IBS per month that lasted from one to three days at a time. Tr. at 43–44. She stated she had symptoms of diabetic neuropathy. Tr. at 53. She endorsed muscle spasms, cramping, stiffness, tingling, and cold sensations. *Id.*

Plaintiff testified she slept for approximately two hours per night. Tr. at 40. She indicated Trazodone had stopped working around June or July 2012. *Id.* She stated she napped throughout the day. *Id.* She indicated she could stand without pain for approximately 10 minutes. Tr. at 42. She stated she could sit for 10 to 15 minutes. *Id.* She testified she could lift two to three pounds. *Id.* She stated she walked with a cane and had used the cane regularly for the last two months. Tr. at 48. She indicated that she had either stumbled or fell on 15 to 20 occasions before she began using her cane regularly. Tr. at 49. She stated her balance was impaired as the result of numbness and tingling in her feet. *Id.* She indicated she could not climb the stairs in her home without her husband's assistance. Tr. at 50–51.

Plaintiff testified she took medications for IBS, pain, and depression. Tr. at 49. She endorsed side effects from medications that included impaired concentration and sleepiness. Tr. at 50. She stated her medication allowed her to better tolerate her pain, but did not take the pain away. Tr. at 54.

Plaintiff testified she had difficulty getting out of bed a few times per week. Tr. at 54. She denied shopping for groceries and performing household chores. Tr. at 40. She stated she attended church approximately once a month. Tr. at 40–41. She indicated she occasionally attended a behavioral activation after care group, but no longer attended yoga or Zumba classes. Tr. at 33. She stated she attended medical appointments, but denied visiting friends or family. Tr. at 41. She indicated her husband sometimes helped her to dress and shower and reminded her to eat. Tr. at 51. She stated her husband did the laundry and household chores. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") William Stewart, Ph. D., reviewed the record and testified at the hearing. Tr. at 54. The VE categorized Plaintiff's PRW as a health care administrator, *Dictionary of Occupational Titles* ("*DOT*") number 187.117-010, as light with a specific vocational preparation ("SVP") of eight as described in the *DOT*, but five or six as she performed it. Tr. at 56. He indicated Plaintiff also worked as a ward clerk, *DOT* number 245.362-014, which is described as light with an SVP of three; an orderly, *DOT* number 355.674-018, which is described as very heavy with an SVP of three; an insurance claims clerk, *DOT* number 241.362-014, which is described as sedentary with an SVP of four; an insurance adjuster, *DOT* number 241.217-010, which is described as sedentary with an SVP of four; and an authorization clerk, *DOT* number 249.367-022, which is described as sedentary with an SVP of three. Tr. at 57–60. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and frequently handle and finger with the bilateral hands. Tr. at 60–61. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a health care administrator, a ward clerk, an insurance adjuster, an insurance claims clerk, and an authorization clerk, as those jobs are generally performed. Tr. at 61. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical individual could perform. *Id.* The VE identified light jobs as an

administrative clerk, *DOT* number 219.362-010, with 3,200 positions in South Carolina and over 100,000 positions nationally and a customer service clerk, *DOT* number 299.367-010, with 3,500 positions in South Carolina and over 100,000 positions nationally.

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who was limited as follows: lift and/or carry ten pounds occasionally and less than 10 pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and frequently handle and finger with the bilateral hands. Tr. at 62. She asked if the hypothetical individual would be able to perform Plaintiff's PRW. *Id.* The VE testified the hypothetical individual could perform Plaintiff's PRW as an insurance adjuster and an authorization clerk. Tr. at 62–63. The ALJ asked the VE to identify other jobs the hypothetical individual could perform. Tr. at 63. The VE identified sedentary jobs that included scheduler, *DOT* number 237.367-010, with 1,400 positions in South Carolina and over 65,000 positions nationally, and admissions clerk, *DOT* number 205.362-018, with 2,300 positions in South Carolina and over 75,000 positions nationally. *Id.*

The ALJ asked the VE to consider a hypothetical individual with the same limitations set forth in the second hypothetical question, but to further assume the individual would require the use of a cane. *Id.* She asked if the individual could perform the jobs identified in response to the second hypothetical question. Tr. at 64. The VE

testified that the need for a cane would still allow the individual to perform the sedentary jobs identified in response to the second hypothetical question. *Id.*

The ALJ asked the VE to consider a hypothetical individual with the same limitations set forth in the third hypothetical, but to further assume the individual was limited to unskilled work. Tr. at 65. She asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE indicated she would not. *Id.* The ALJ asked if the individual could perform any work available in the local or national economy. *Id.* The VE testified the individual could perform unskilled, sedentary jobs as an order clerk, *DOT* number 209.567-014, with 2,460 positions in South Carolina and 95,000 positions nationally, and a table worker, *DOT* number 739.687-182, with 3,600 positions in South Carolina and over 125,000 positions in the national economy. Tr. at 66.

For a fifth hypothetical question, the ALJ asked the VE to assume a hypothetical individual with the same vocational factors and impairments indicated in the fourth hypothetical question, but to further assume that the individual was limited as stated in Plaintiff's testimony. *Id.* She asked if the hypothetical individual would be able to perform the claimant's PRW or any work available in the local or national economy. *Id.* The VE stated she would not be able to perform any work on a productive, reliable, and sustained basis. *Id.*

The VE testified that his testimony was consistent with the *DOT*, with the exception of his testimony as to how Plaintiff's actual performance of some of her jobs differed from their *DOT* descriptions. *Id.*

27

Plaintiff's attorney asked the VE to assume that the individual would miss seven or more workdays per month because of symptoms of IBS or migraines. Tr. at 67. He asked if the individual could perform any work. *Id.* The VE stated that no jobs would allow an individual to miss that many days of work. *Id.*

2.    The ALJ's Findings

In her decision dated March 31, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 15, 2008 through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: carpal tunnel syndrome (CTS), diabetes mellitus (DM), neuropathy, degenerative disc disease with facet arthropathy, fibromyalgia, and migraines (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant can lift up to 20 pounds occasionally; lift or carry up to 10 pounds frequently; sit approximately 6 hours in an 8-hour workday with normal breaks. The claimant is limited to no more than occasional balancing, stooping, kneeling, crouching, or crawling, and climbing of ramps or stairs; but can never engage in the climbing of ladders, ropes, or scaffolds. The claimant can engage in frequent bilateral handling and fingering.

6.    Through the date last insured, the claimant was capable of performing past relevant work as an administrator, health care; ward clerk; insurance claims clerk; insurance adjuster; and authorization clerk/authorizer. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant was not under a disability, as defined in the Social Security Act, at any time from October 15, 2008, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(f)).

Tr. at 13–24.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ did not appropriately consider that the VA had assessed Plaintiff as having a 100% impairment rating;

2)     the ALJ did not consider all of Dr. Daniels' findings;

3)     the ALJ erred in concluding that Plaintiff did not report symptoms to her physician;

4)     the ALJ failed to consider Plaintiff's depression to be a severe impairment;

5)     the ALJ neglected to properly analyze whether Plaintiff's fibromyalgia met or equaled a Listing;

6)     the ALJ erred in according great weight to Dr. DePace's opinion; and

7)     the ALJ failed to properly evaluate Plaintiff's subjective allegations of pain and the limitations imposed by her severe impairments.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The

scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    VA Rating Decision

The record contains a decision from the VA dated December 5, 2012, that increased Plaintiff's disability percentage rating for major depressive disorder from 30%

to 50%, effective June 8, 2012. Tr. at 517. It indicated continued disability ratings for other impairments as follows: 50% for hysterectomy; 50% for migraine headaches; 20% for lumbar strain; 20% for diabetes with gastroparesis, diabetic retinopathy, and cataracts; 20% for CTS of the right wrist with peripheral neuropathy; 20% for CTS of the left wrist with peripheral neuropathy; 20% for neuropathy of the right lower extremity to include radiculopathy associated with diabetes; 20% for neuropathy of the left lower extremity to include radiculopathy associated with diabetes; 10% for IBS; and 10% for a tender scar following total hysterectomy. Tr. at 518–21. The decision reflected an overall disability rating percentage of 100% effective November 6, 2007. Tr. at 522.

The decision explained that Plaintiff's disability percentage was increased from 30% to 50% for major depressive disorder based on occupational and social impairment with reduced reliability and productivity; difficulty in establishing and maintaining effective work and social relationships; disturbances of motivation and mood; chronic sleep impairment; and depressed mood. Tr. at 527. It indicated Plaintiff had a GAF score of 55, which reflected moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

Although the decision did not reflect increased disability ratings for other impairments, it provided the reasons for the continued ratings. Tr. at 528–30. It explained that the 50% disability rating for hysterectomy was based on removal of Plaintiff's uterus and both ovaries. Tr. at 528. It provided the 50% impairment rating for migraine headaches reflected a record that showed "very frequent, completely prostrating, and prolonged attacks productive of severe economic inadaptability." Tr. at 528–29. It

indicated the 20% disability rating for lumbar strain was based on forward flexion of the thoracolumbar spine greater than 30 degrees, but not greater than 60 degrees. Tr. at 529. It explained that the 20% disability rating for diabetes mellitus was assigned based on a "requirement for oral hypoglycemic agent." *Id.* It indicated the 20% impairment rating for CTS of the right wrist with peripheral neuropathy was consistent with "neuralgia of the musculospiral nerve (radial nerve), based on mild incomplete paralysis of the major extremity." *Id.* It provided the 20% disability rating for CTS of the left wrist with peripheral neuropathy was "based on mild incomplete paralysis of the minor extremity." Tr. at 530. It assigned a 10% disability rating for neuralgia of the sciatic nerve "based on mild incomplete paralysis." Tr. at 531.

Plaintiff argues the ALJ erred in failing to accord appropriate weight to the VA's rating of 100% disability. [ECF No. 7 at 8]. She maintains that, although the ALJ mentioned *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012), she neglected to consider the impairment rating as contemplated in *Bird*. *Id.* She contends the ALJ did not adequately explain her decision to give the VA's impairment rating "some to little weight." *Id.*

The Commissioner argues the ALJ properly analyzed Plaintiff's impairments in accordance with the Fourth Circuit's decision in *Bird*, but concluded that the VA did not review the six experts' opinions that found she was not disabled and failed to find any singular impairment to be 100% disabling. [ECF No. 8 at 1].

Pursuant to SSR 06-3p, ALJs must consider disability decisions rendered by other agencies. Although the SSA is not bound by another agency's decision, ALJs must

"explain the consideration given to these decisions in the notice of decision . . . ." SSR 06-3p. The Fourth Circuit has recognized a heightened explanation requirement with respect to disability decisions rendered by the VA. *Bird*, 699 F.3d at 343. The court acknowledged similarities between the VA's and the SSA's disability determination processes and concluded that "[b]ecause the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* It held that "in making a disability determination, the SSA must give substantial weight to a VA disability rating." *Id.* However, it provided that ALJs may give less than substantial weight to the VA's disability rating "when the record . . . clearly demonstrates that such a deviation is appropriate." *Id.*

The ALJ indicated she had considered the VA rating decision, but explained that "[t]he laws defining 'disability' for military disability and veteran's programs are based on a percentage schedule for rating disabilities" and "[t]hat definition is not consistent with the definition of 'disability' in the Social Security Act." Tr. at 21. She stated she was "mindful of Bird v. Commissioner, 699 F.3d 337, 343 (4th Cir. 2012)," but that "because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such deviation is appropriate.'" *Id.* She concluded that "[t]he overall evidence in this case supports reducing the VA disability rating to some to little weight given the opinions of SSA's examiners and the record in

this case." *Id.* Finally, she provided that the nonexertional limitations in Plaintiff's RFC adequately accounted for the VA's percentage ratings. *Id.*

The ALJ correctly asserted that differences exist between the VA's evaluation procedures and those used by the SSA. The schedule for rating disabilities under the VA compensation system is "based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations." 38 U.S.C.A. § 1155 (2014). The schedule provides ten grades of disability that range from 10 to 100 percent. *Id.* Impairment ratings are based on the average reduction to the individual's "occupational earning capacity" and, therefore, an individual assigned an impairment rating of 100% would be "deemed totally disabled." *Id.* at n.10, citing *Swan v. Derwinski*, 1 Vet. App. 20 (Vet. App. 1990). The SSA's criteria, on the other hand, are based on a much more individualized analysis that considers the effect of impairments on the individual's functional abilities instead of presuming that certain conditions combine to preclude employment. *See* 20 C.F.R. § 404.1520. Therefore, the fact that an individual has a 100% disability impairment rating from the VA does not necessarily mean that she can meet the burden to prove she is disabled under the Social Security Act.

Nevertheless, ALJs are held to a high burden in rejecting a VA disability determination that cannot be overcome by citing the differences in the two evaluation processes. *See Bird*, 699 F.3d at 343. Here, the ALJ relied upon the language in *Bird* that indicated she could accord less than substantial weight to a VA disability rating to support her decision to give "some to little weight" to Plaintiff's VA disability determination. However, she failed to discuss the VA's specific findings and did not

adequately explain why the record demonstrated that the deviation was appropriate. She assessed several of the same severe impairments as those assessed by the VA. *Compare* Tr. at 13, *with* Tr. at 517–22. While the VA's decision did not indicate that specific work-related limitations resulted from most of these impairments, it did suggest work-related limitations as a result of migraines and major depressive disorder.[5]

The VA's decision explained that Plaintiff was assessed a 50% disability rating for migraines because the record showed "very frequent, completely prostrating, and prolonged attacks productive of severe economic inadaptability." Tr. at 528–29. The ALJ did not acknowledge the VA decision's indication that Plaintiff had specific work-related limitations as a result of migraines. *See* Tr. at 21. She summarily concluded that "the medical evidence of record does not support claimant's testimony regarding . . . migraines with aura issues" based on Plaintiff's failure to provide detailed accounts of migraines to her physicians. Tr. at 20. The undersigned's review of the record suggests the ALJ's conclusion regarding Plaintiff's migraines was contrary to the evidence. *See* Tr. at 504 (Plaintiff reported to Dr. DePace that she had suffered from migraines for several years), 604–05 (Dr. Irizarry indicated Plaintiff had been diagnosed with migraines, but was unable to take medications to treat them because of liver problems), 605–06 (Dr. Irizarry noted that Plaintiff's migraines worsened with activity; were accompanied by nausea, vomiting, and sensitivity to light and sound; occurred more often than once a month; and lasted for more than two days at a time), 608 (Dr. Irizarry stated Plaintiff's migraines impacted her ability to work), 670 (Plaintiff told Dr. Parnell that she

---

[5] The ALJ did not recognize major depressive disorder as a severe impairment. Tr. at 15.

had difficulty sleeping because of migraines and other physical impairments), 704 (Plaintiff indicated to Dr. Johnson that she felt hopeless as a result of her migraines and other physical impairments), 766 (her husband informed the nurse that Plaintiff was in bed with a migraine when she called to discuss the A1c results). Therefore, the undersigned recommends the court find the ALJ did not adequately consider and explain her reason for rejecting the VA's assessment of Plaintiff's disability resulting from migraines as directed by the court in *Bird*.

The VA also assessed a 50% impairment rating for major depressive disorder that the ALJ neglected to specifically consider. Tr. at 527. The ALJ determined major depressive disorder was a nonsevere impairment and assessed no limitations because she found that it resulted in no episodes of decompensation and no more than mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace. Tr. at 15. While the ALJ cited evidence to support her conclusion, she neglected to reconcile it with the VA's determination that Plaintiff had moderate limitations in the relevant functional areas that resulted in specific work-related limitations. *Compare* Tr. at 15 (finding mild limitations in activities of daily living because Dr. DePace determined Plaintiff had the cognitive ability to perform all activities of daily living; assessing mild limitations in social functioning because Plaintiff testified she attended church once a month and participated in yoga and Zumba and because she had a history of being able to appropriately interact in the workplace; and determining Plaintiff had mild limitations in concentration, persistence, or pace because she drove on occasions and Dr. DePace indicated he believed she was able to perform three-step commands), 21–22 (noting

Plaintiff's mental health treatment at the VA, the effectiveness of her medication, and Dr. DePace's impressions), *with* Tr. at 527 (finding moderate symptoms or moderate difficulty in social and occupational functioning based on occupational and social impairment with reduced reliability and productivity, difficulty in establishing and maintaining effective work and social relationships, disturbances of motivation and mood, chronic sleep impairment, and depressed mood). She placed significant emphasis on Dr. DePace's suggestion that Plaintiff may be exaggerating or malingering her emotional problems, but failed to consider that his opinion was admittedly rendered without the benefit of additional records, whereas the VA's disability determination was based on a review of the record. *Compare* Tr. at 504 ("There was no information in the medical record other than a form SSA-5002 that was completed by her disability examiner."), *with* Tr. at 527 ("The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for 50 percent disability evaluation."). The ALJ's decision reflects no meaningful consideration of the VA's impairment rating for major depressive disorder and, thus, fails to provide a substantial basis for her decision to reject the VA's determination.

Although the Commissioner argues that substantial evidence supports the ALJ's decision to give less than substantial weight to the VA's disability decision based on the Social Security consultants' opinions, "the overall evidence in the case," and her inclusion of nonexertional limitations, the undersigned is not persuaded by these arguments. While the Commissioner and the ALJ indicated the VA's decision did not consider the opinions and examinations of the SSA's consultative examiners and state

agency consultants, the undersigned notes that these consultants and examiners did not consider the entire record. This is particularly relevant with regard to Plaintiff's symptoms of major depressive disorder. Dr. DePace examined Plaintiff on March 28, 2012, and Dr. Brown and Dr. King completed the PRTFs on December 2, 2011, and April 3, 2012. Tr. at 106–07, 120–21, 504–07. Plaintiff's mental health treatment began after these consultants rendered their opinions and her percentage increase for major depressive disorder became effective thereafter, as well. Although Plaintiff contacted Dr. Lopez to report symptoms of anxiety and difficulty sleeping in December 2011, she did not actually report to Dr. Kene-Ewulu with symptoms of depression until April 10, 2012, and did not apply to the VA for an increased compensation rating for depression until June 8, 2012. *See* Tr. at 482–84, 517, 713–14. In light of the fact that Dr. King and Dr. DePace did not review the majority of the evidence that pertained to Plaintiff's major depressive disorder, the undersigned cannot find that the ALJ reasonably relied upon their opinions to support her decision to accord "some to little weight" to the VA's disability rating.

As discussed above, the ALJ ignored pertinent evidence with regard to Plaintiff's impairments. Therefore, the undersigned cannot find that she cited sufficient evidence to show that "the overall evidence in the case" supported her decision to deviate from a standard that required she accord substantial weight to the VA's disability decision, unless the record clearly demonstrated that deviation was appropriate.

Although the Commissioner argues the assessed RFC accounts for all of Plaintiff's impairments, the undersigned notes that the only nonexertional limitations included in the

RFC assessment were for no more than occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; and frequent bilateral handling and fingering. The undersigned is unable to perceive a connection between these nonexertional limitations and any functional limitations imposed by Plaintiff's migraines and major depressive disorder. In light of the foregoing, the undersigned recommends the court find the ALJ failed to adequately consider the VA's 100% disability rating.

2.     Plaintiff's Remaining Allegations of Error

Because the undersigned recommends remand for the ALJ to reconsider the VA's disability decision, Plaintiff's remaining allegations of error are not addressed.   The undersigned notes, however, that the ALJ's assessment of the VA ratings may be relevant to the assessment of Plaintiff's severe impairments, her RFC, her pain and other symptoms, and the medical opinions of record.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

41

IT IS SO RECOMMENDED.

April 25, 2016                                    Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).